UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| ANDREA BECKWITH, EAST COAST SCHOOL OF SAFETY, NANCY COSHOW, JAMES WHITE, J WHITE GUNSMITHING, ADAM HENDSBEE, A&G SHOOTING, THOMAS COLE, AND TLC GUNSMITHING AND ARMORY,<br><br>    Plaintiffs<br><br>    v.<br><br>AARON FREY, ATTORNEY GENERAL OF MAINE,<br><br>    Defendant | No. 1:24-cv-00384-LEW |

**ORDER ON PLAINTIFFS' MOTION FOR**
**<u>PRELIMINARY INJUNCTIVE RELIEF</u>**

The Plaintiffs in this action challenge the constitutionality of 25 M.R.S. § 2016 ("Waiting period after sale of firearm"). The matter is before the Court on Plaintiffs' Motion for Preliminary Injunctive Relief (ECF No. 4), which I now grant.

## BACKGROUND

Effective August 9, 2024, Maine law outlaws the delivery of firearms from sellers to buyers before 72 hours have passed from the date of the underlying firearm sales transaction. 2024 Me. Legis. Serv. Ch. 678 (S.P. 958) (L.D. 2238) ("An Act to Address Gun Violence in Maine by Requiring a Waiting Period for Certain Firearm Purchases")

("the Act").¹  As worded by the Maine Legislature:  "A seller may not knowingly deliver a firearm to a buyer pursuant to an agreement sooner than 72 hours after the agreement." 25 M.R.S. § 2016(2).  The Act is enforced exclusively against sellers.  Sellers who violate its provisions are subject to a fine of between $200 and $500 for a first violation and $500 and $1000 for each successive violation.  *Id.* § 2016(3).

Plaintiffs are Maine citizens and businesses and include federally-licensed firearm dealers.  Plaintiffs allege that the Act violates the Second Amendment rights of persons who seek to exercise the right to keep and bear arms.²  They name as Defendant Aaron Frey, Attorney General of the State of Maine, who is tasked with the enforcement of the Act's penalty provision.  *See* 17-A M.R.S. § 4-B.

The Maine Legislature's passage of the Act occurred in the wake of the October 25, 2023, devastating mass shooting in Lewiston and the Legislature has expressed as cause for the Act concern for persons who may purchase a firearm with the immediate purpose

---

[1] The Act exempts certain sales transactions from its coverage, including sales to law enforcement and corrections officers, sales between dealers, and sales between family members.  25 M.R.S. § 2016(4).

[2] Among the Plaintiffs there is also an individual purchaser of a firearm, who complains of the waiting period she was subjected to, and a business proprietor who offers firearm training and consulting services to victims of domestic violence who fear for their lives.  Although most of the Plaintiffs are sellers, they are entitled to pursue derivative claims based on the Second Amendment rights of their customers.  *Gazzola v. Hochul*, 88 F.4th 186, 194-95 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 2659 (2024) (collecting cases).  *See also*, *e.g.*, *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582 (2016); *id.* at 630-32 (Thomas, J., dissenting) (collecting cases).  Furthermore, the 72-hour waiting period is short enough that it would be difficult and impractical for a would-be buyer of a firearm to file a lawsuit and obtain an injunction before the expiration of the waiting period.  In this scenario, it is, unsurprisingly, chiefly sellers rather than buyers who seek to invalidate the Act.  *Miller v. Albright*, 523 U.S. 420, 449 (1998) (O'Connor, J., concurring) ("Where insurmountable procedural obstacles preclude a rightholder's own suit, the Court has also accorded third-party standing.")  In any event, the non-firearm-dealer plaintiffs in this case (all of the individuals) are in part vindicating their own, ongoing, individual right to purchase a firearm without having the purchase subjected to the waiting period.  And not to be overlooked, the seller Plaintiffs also have standing based on the negative impact the Act has on their trade and the threat of civil enforcement proceedings.

of doing harm to themselves or others. The Defendant contends that empirical data and statistics suggest that waiting periods (colloquially coined "cooling-off periods") reduce homicide and suicide rates (by firearm) in the states that enact them. This decision ultimately does not pass judgment on the legislative intent or the efficacy of the Act and, consequently, I do not relate here the evidence offered by the parties concerning legislative intent or anticipated outcomes.

## DISCUSSION

Through this action, the Plaintiffs seek to vindicate the Second Amendment right to keep and bear arms. Through their pending Motion, they seek an order that enjoins enforcement of the Act on a preliminary emergency basis, ahead of the final review of their claim on the merits. As cause, they cite the unconstitutionality of the Act and the general presumption that the deprivation of a constitutional liberty imposes an immediate and irreparable harm that cannot be cured by an after-the-fact remedy such as an award of money damages.[3]

In order to obtain preliminary injunctive relief, Plaintiffs must demonstrate: (1) that they are likely to succeed on the merits of their Second Amendment claim; (2) that they are likely to suffer irreparable harm absent interim relief; (3) that the balance of equities tips in their favor; and (4) that injunctive relief would serve the public interest. *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 171 (1st Cir. 2015); *Nat'l Org. for Marriage v. Daluz*, 654 F.3d 115, 117, 119-20 (1st Cir. 2011). Preliminary

---

[3] Because their civil action against AG Frey is the functional equivalent of an action against the State of Maine, sovereign immunity would prevent Plaintiffs from recovering money damages based on their personal harms, such as harms to their business operations and revenue.

injunctive relief is understood to be an "extraordinary and drastic" form of equitable relief reserved for extraordinary and drastic situations. *US Ghost Adventures*, *LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024).

For the following reasons I find that Plaintiffs have carried their burden.

A.    **Likelihood of Success on the Merits**

"Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996). On this issue "the district court is required only to make an estimation of likelihood of success and 'need not predict the eventual outcome on the merits with absolute assurance.'" *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (quoting *Ross–Simons*, 102 F.3d at 16)).

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The Second Amendment confers an individual right on all members of the political community to keep and bear arms, in case of confrontation, of the kind "typically possessed by law-abiding citizens for lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 592 (confrontation), 625 (kind of arms), *passim* (individual right) (2008).

When considering a Second Amendment challenge to a legislative enactment, the first consideration is whether "the Second Amendment's plain text covers" the conduct curtailed by the enactment. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). If it does, then "the Constitution presumptively protects that conduct." *Id.*

In such cases, it is the Government's burden not merely to justify its enactment based on its ability to "promote[] an important interest," but to demonstrate that its curtailment of the right to keep and bear arms "is consistent with this Nation's historical tradition of firearm regulation." *Id.* If the Government cannot demonstrate that the proscribed conduct falls within the parameters of a historical restriction on firearms access, then the enactment will succumb to the "unqualified command of the Second Amendment [that] 'the right of the people to keep and bear Arms shall not be infringed.'" *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 n.10 (1961). *See Bruen*, 597 U.S. at 17.

### 1. *The acquisition of firearms is covered by the Second Amendment's plain text.*

Attorney General Frey argues that the act of purchasing or acquiring a firearm was not comprehended by the Founders when they enshrined the right to "keep and bear" arms in the Bill of Rights. Def.'s Opp'n (ECF No. 13) at 5-11. In his view, the Second Amendment only protects one's ability to keep and bear arms already possessed and does not provide "an unfettered right to immediately acquire them free of any regulation." *Id.* at 6. *See also id.* at 7 (collecting cases to that effect). Though Frey concedes that the Constitution makes inviolate a right to keep and bear arms, he asserts that it does not protect the corollary right to acquire arms, which is a curious construction indeed. It is an interpretation that is not only unsupported by the text of the Constitution but one that makes the core right to keep and bear arms illusory if it is relegated to those arms in circulation at the time of the founding or through sales not subject to a background check. In support, Frey cites, among other authorities, the *Heller* Court's construction of "keep and bear" as encompassing having and possessing, which to Frey implies the exclusion of acquiring.

5

*Id.* at 5 (citing *Heller*, 554 U.S. at 583-84). For their part, Plaintiffs assert that "laws that prevent people from acquiring arms self-evidently restrict the right to 'keep and bear Arms.'" Pls.' Reply (ECF No. 24) at 2.

Though it is certainly correct that to keep and bear encompasses the right to have or possess arms (and to carry arms), the *Heller* Court considered a handgun ban that prohibited possession altogether, subject only to a narrow and discretionary licensing exception. *Heller*, 554 U.S. at 628. The *Heller* Court did not consider a law that temporarily bans taking possession of a firearm through an otherwise lawful sale by dictating when the seller may permit the buyer to carry the firearm away. Here, however, we consider an enactment that temporarily bans keeping, bearing, and carrying activity that would otherwise occur but for its proscription.

If a citizen cannot take possession of a firearm then his or her right to possess a firearm or to carry it away is indeed curtailed, even if, as Frey claims, the curtailment is modest. However, the threshold inquiry is whether the Second Amendment covers the conduct curtailed by the Act, not a qualitative assessment of how modest the imposition on the right happens to be. Citizens wishing to purchase a firearm are dispossessed of one for 72 hours exclusively by operation of the Act's requirement that everyone be subjected to a "cooling off" period, even those who have passed an instant background check at the FFL dealer's counter. That is indiscriminate dispossession, plain and simple. Attorney General Frey impliedly concedes the point by suggesting that the Act merely prohibits "immediate" possession through a "commercial transaction," emphasizing that the infringement is only temporary and presumptively subject to regulation. Def.'s Opp'n at

6

7 ("[T]he Second Amendment's plain text does not apply to the purchase of firearms, *or at least not the immediate purchase of firearms*." (emphasis added)).[4] To the extent those arguments made in mitigation are relevant, they may bear on the second prong of the analysis but do not call into question whether as an initial matter the Act impairs conduct presumptively covered by the Second Amendment. Acquiring a firearm is a necessary step in the exercise of keeping and bearing a firearm. Any interpretation to the contrary requires the type of interpretative jui jitsu that would make Kafka blush.

As for the regulatory overlay that attends the commercial sale of firearms, precious few individuals make their own firearms. Firearms have always been articles of commerce.

---

[4] *See also* Def.'s Opp'n at 9 ("Theoretically, regulations on firearm sales could be so burdensome that they effectively prohibit the acquisition of firearms and interfere with the right to keep and bear arms . . . ."). Attorney General Frey quotes liberally from out-of-circuit opinions and decisions, which apparently represent a surprise revival of the textualist judicial tradition from some rather unexpected quarters. They are unpersuasive insofar as they express the very same tell of overly qualified reasoning in service of something other than giving ordinary effect to the plain words of the Second Amendment, including *B&L Products, Inc., v. Newsom*, 104 F.4th 108, 117 (9th Cir. 2024) (holding that the right to keep and bear "says nothing about commerce"); *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024) ("'keep and bear' does not include purchase—let alone without a background check"); *Vermont Federation of Sportsmen's Clubs v. Birmingham*, -- F. Supp. 3d ---, 2024 WL 3466482, at *22 (D. Vt. July 18, 2024) ("[T]he 'right of the people to keep and bear Arms,' . . . does not facially include a right to immediately obtain a firearm through a commercial sale."); *Ortega v. Lujan Grisham*, -- F. Supp. 3d --, 2024 WL 3495314, at *26 (D.N.M. July 22, 2024) ("Having considered the normal and ordinary meaning of the Second Amendment's language, the Court agrees . . . that the Second Amendment's plain text does not cover purchasing firearms." (internal quotation marks omitted)); and *Rocky Mountain Gun Owners v. Polis*, 701 F. Supp. 3d 1121, 1132 (D. Colo. 2023) ("[T]he receipt of a paid-for firearm without delay is not covered." (cleaned up)).

For example, in *Bruen*, the Supreme Court instructed courts to ask whether the conduct proscribed by a law falls within the plain text of the Second Amendment, but it did not then draw the obviously silly conclusion that the petitioners must lose because the Second Amendment does not expressly specify home use versus public use or open carry versus concealed carry. Instead, the Court looked to history to inform the meaning of the language of the Second Amendment, while also considering what the language must naturally mean in order for the Second Amendment to protect the right the keep and bear arms. *Bruen*, 597 U.S. at 32 ("Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms. . . . [The] definition of 'bear' naturally encompasses public carry. . . . To confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections.").

There is nothing novel or nefarious about that basic reality that would warrant torturing the concepts of keeping, bearing, or carrying to exclude from their meaning the acquisition or purchase of a firearm.[5] In *Heller*, the Supreme Court observed that nothing in its holding "should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms," 554 U.S. at 626-27, but it gave no examples of what kind of regulations fall within this particular regulatory safe harbor. *Id.* n.26. This might well entail background checks, age restrictions, shop security measures, and the like. It does not automatically extend to a standardless, temporary disarmament measure. The question is, simply, whether the purchase of a firearm is a basic component of the right to keep and bear arms. The *Heller* Court did not answer the question and all indications in the wake of *Heller*, *Bruen* and *Rahimi* suggest the Supreme Court would view with great skepticism the argument Attorney General Frey advances here.

Attorney General Frey otherwise argues that the Act is presumptively lawful because it is no more burdensome than any other "shall-issue" legislative scheme that subjects firearm buyers to a background check, and that like those schemes the Act simply imposes a brief waiting period based on "narrow, objective, and definite standards," citing *Bruen*'s much-discussed ninth footnote.[6] Def.'s Opp'n at 6 (quoting *Bruen*, 597 U.S. at 38

---

[5] The right to keep and bear arms is one we "inherited from our English ancestors." *Heller*, 554 U.S. at 599 (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). Without being presumptuous about the founding generation's access to English language etymologies, in fact the word "keep" was used by our English-speaking forebears to mean taking or acquiring, though the grammar and diction of those forebears would be incomprehensible to a modern English speaker. *Keep*, Oxford English Dictionary, oed.com/dictionary (entry I.1.: "To seize, lay hold of; to snatch, take. Obsolete.").

[6] *Bruen*'s ninth footnote:

*(continued next page)*

n.9, and citing *Heller*, 554 U.S. at 627 n.26, and *McDonald*, 561 U.S. at 786, concerning "conditions and qualifications on the commercial sale of arms"); *see also* Def.'s Opp'n at 9-10 (speaking of the "presumption" of the Act's "lawfulness"). However, as discussed in the following section, the Act applies no standard at all, unless what is meant by the word standard is a prescriptive standard of what the Maine Legislature sees as the ideal behavior of firearm sellers, rather than an evaluative standard to determine whether individual buyers should have their rights suspended.[7]

Because the act of acquiring a firearm, including by purchase, falls within the ambit of what it means to keep and bear arms, it is presumptively protected by the Second Amendment. *See Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, -- F.4th

---

To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes, under which "a general desire for self-defense is sufficient to obtain a [permit]." *Drake v. Filko*, 724 F.3d 426, 442 (CA3 2013) (Hardiman, J., dissenting). Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent "law-abiding, responsible citizens" from exercising their Second Amendment right to public carry. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). Rather, it appears that these shall issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, "law-abiding, responsible citizens." *Ibid*. And they likewise appear to contain only "narrow, objective, and definite standards" guiding licensing officials, *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969), rather than requiring the "appraisal of facts, the exercise of judgment, and the formation of an opinion," *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940)—features that typify proper-cause standards like New York's. That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.

*Bruen*, 597 U.S. at 38 n.9 (parallel S.Ct. and L.Ed. citations omitted).

[7] Backgrounds checks once disarmed individuals for comparable lengths of time, or longer, but they at least were designed to implement a standard against which to measure an individual's background. Today, background checks impose only momentary delays. Insisting that a more prolonged waiting period occur because it is no greater in length than early background checks overlooks the fact that background checks impose a standard and waiting periods do not.

--, 2025 WL 340799, at *5 (5th Cir. Jan. 30, 2025).[8]  Consequently, it is Attorney General Frey's burden to establish not only that the Act "promotes an important interest," but to demonstrate that the Act's curtailment of the right to keep and bear arms "is consistent with this Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 17.[9]

### 2. *The Act's cooling-off period is inconsistent with the Nation's historical tradition of firearm regulation.*

"Like most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626.  "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.*  Still, the challenge of demonstrating that the curtailment of Second Amendment rights is consistent with our Nation's history and tradition does not boil down to means-ends, costs-benefits, or any

---

[8] In *Reese*, the Fifth Circuit observed:

> Because constitutional rights impliedly protect corollary acts necessary to their exercise, we hold that [the Second Amendment covers the commercial purchase of firearms].  To suggest otherwise proposes a world where citizens' constitutional right to "keep and bear arms" excludes the most prevalent, accessible, and safe market used to exercise the right.  The baleful implications of limiting the right at the outset by means of narrowing regulations not implied in the text are obvious; step by step, other limitations on sales could easily displace the right altogether.

-- F.4th --, 2025 WL 340799, at *5.

[9] In the following section, I discuss only the history and tradition inquiry, not whether the Act promotes an important interest.  Attorney General Frey and multiple amici have presented evidence that a cooling off period can prevent rash homicidal or suicidal behavior with firearms.  *See* Def.'s Opp'n *passim*; Brief of Amici Curiae Maine Gun Safety Coalition, Maine Coalition to End Domestic Violence, Maine Association of Psychiatric Physicians, Brady Center to Prevent Gun Violence, and Giffords Law Center to Prevent Gun Violence in Support of Def.'s Opp'n to Pls.' Mot. to Prelim. Inj. (ECF No. 20) *passim*.  Suffice it to say that the objectives of the Act are not arbitrary and capricious such that they would offend the Fourteenth Amendment but for the overlay of Second Amendment jurisprudence that steers my review.  Beyond that observation, however, it is emphatically not my assigned role to engage in an analysis that involves a comparative weighing of respective interests.  *See Bruen*, 597 U.S. at 22-25; *Heller*, 554 U.S. at 634; *McDonald v. City of Chicago*, 561 U.S. 742, 790-91 (2010).

other interests-balancing analysis. *Bruen*, 597 U.S. at 22-25; *Heller*, 554 U.S. at 634; *McDonald v. City of Chicago*, 561 U.S. 742, 790-91 (2010). Instead, Attorney General Frey must identify one or more historical analogues that suggest that the Act has a precedent and that it cuts against the right to keep and bear arms no more stridently than laws that existed in the Colonial or Reconstruction Periods. *Bruen*, 597 U.S. at 27. But to the extent the societal concern addressed by the Act is unprecedented or involves dramatic changes in technology, such that a historical analogue is not readily available for purposes of comparison, Frey may still be able to justify the Act through a "more nuanced approach" to the history and tradition inquiry. *Id.*; *see also Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024). After all, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Bruen*, 597 U.S. at 28.

With this nuanced approach, the question is whether the Act is "consistent with the principles that underpin our regulatory tradition" and/or is "'relevantly similar' to laws that our tradition is understood to permit." *United States v. Rahimi*, 602 U.S. 680, 692 (2024) (quoting *Bruen*, 597 U.S. at 29). "Why and how [the Act] burdens the [Second Amendment] right are central to this inquiry." *Id.* Important criteria are whether the Act employs "narrow, objective, and definite standards" to justify the curtailment of the right to keep and bear arms. *Bruen*, 597 U.S. at 38 n.9.

Frey concedes that waiting period laws implicate unprecedented societal concerns or dramatic changes and therefore call for the "more nuanced" approach. Def.'s Opp'n at

11

11-15. In fact, there is no readily comparable precedent before the Twentieth Century.[10] For most persons, the immediate, impulsive purchase of a firearm was not an option given the lack of access to a seller or even the funds to make a purchase. Most persons bent on mayhem or self-harm in earlier times would have to rely on whatever weapons were at hand or obtain a firearm by means other than a purchase at a local gun shop. In such societal conditions, a law imposing a waiting period would lack efficacy and would likely be unadministrable in any event. Consequently, the question is not whether Frey can point to a closely analogous, historical precursor, he cannot, but whether the "how and why" of the Act measure up to "the principles that underpin our regulatory tradition," *Rahimi*, 602 U.S. at 692, and importantly whether the Act employs "narrow, objective, and definite standards." *Bruen*, 597 U.S. at 29, 38 n.9.

Frey argues that the how and why of the Act under review is aligned with delays associated with background checks and licensing in general, or perhaps with statutes that have long prohibited persons from publicly carrying firearms while intoxicated. Def.'s Opp'n at 15-16. To this, Plaintiffs reply that at least those kinds of restrictions involve a "condition or qualification . . . a person can satisfy," not an absolute prohibition uninformed by any individualized consideration. Pls.' Reply at 3; *see also id.* at 6. Plaintiffs have the better of this argument.

---

[10] The late Twentieth Century at that. Statutory schemes that impose a waiting period on persons who have already passed a background check, separate and apart from waiting periods associated with processing a license application, started to appear in the 1990s. Waiting period laws are distinct from laws that produce delay occasioned by bureaucratic procedures in firearm licensing or permitting states, which procedures typically include firearm safety instruction and mental health records checks in addition to background checks, all of which amount to individualized standards for license eligibility. *See* Def.'s Opp'n at 17 ("Licensing laws impose[] a delay until licensing authorities [can] be certain that the relevant criteria [are] met.").

The hows and whys of background checks and drunken-carry laws do not align with the how and why of the Act presently under review. Background checks are designed to generate cause for denying a sale to a given buyer and include a series of objectively verifiable criteria by which to do so. Background checks represent a suite of narrow and definite conditions that can be met. The national instant background check form inquires about the purchaser's prohibited person status in the form of mental health history, criminal history, and drug use or addiction, among other things. Both the how and the why entail individual inquiries and consequences.

Prohibitions against drunken carry are similar, the how of enforcement is based on an individualized assessment, though the why arises from our common understanding that mixing guns and excessive alcohol is fraught with peril. A near globally-applied waiting period detached from narrow and definite standards departs from these approaches. With a waiting period the how and the why entail generalized assumptions and global consequences. Worse, those assumptions are based on the statistical likelihood of aberrant behavior by a small subset of individuals rather than our understanding of the expected, law-abiding behavior of the many. And the consequences are absolute and universal, not conditional and individual. No one carries away a firearm before the passage of 72 hours from its purchase, regardless of individual circumstance. Such an indiscriminate waiting period law is not characteristic of our Nation's regulatory tradition as that tradition is reflected in background checks and prohibitions against drunken carry.[11]

---

[11] Attorney General Frey also references abjectly prejudicial laws that once banned certain minorities from owning firearms out of a fear of what they might do. Def.'s Opp'n at 17 & n.14. Not unlike the fear that informs the Act, those laws were motivated by a fear that certain persons should not acquire firearms.
*(continued next page)*

13

Beyond the lack of a suitable regulatory analogue in our Nation's history and tradition, waiting period laws like the one contained in the Act do not employ narrow, objective, or definite standards to justify disarming individuals. This Act does not actually employ any standard at all, objective, narrow, definite or otherwise. Whereas one might pass a background check or avoid prosecution for drunken carry by demonstrating a clean record or sobriety, respectively, law-abiding citizens cannot overcome Maine's 72-hour ban by measuring themselves against and affirmatively satisfying a standard. But assuming for the sake of argument that the requirements of the Act actually involve the application of a standard, how can that standard be characterized as "narrow" or "objective" or "definite"?

The waiting period is not narrow since it applies to very near everyone seeking to purchase a firearm and their entire right to keep and bear any firearm at all through purchase is temporarily banned. Nor is the waiting period objective since it does not permit the evaluation of facts as they pertain to the individual seeking to carry away the firearm. Sellers are not tasked with inquiring whether buyers are intent on harming themselves or

---

Assuming that laws offensive to the Equal Protection Clause are appropriate analogues to consider, they are still distinct from a waiting period because a waiting period applies to most everyone without exception, whereas prejudicial carry laws prohibited keeping and bearing firearms based on an individual's membership in a disfavored group that lawmakers presumed had a predilection or interest in armed insurrection. There was, once again, a standard at work, albeit a bigoted one. Today, in Maine, there is no viable presumption that everyone in the body politic or even the average person who seeks to purchase a firearm is inclined toward self-harm or other mayhem. The Act imposes a Constitutional injury to the entire body politic based on a fear as to the behavior of a few. That does not align with our Nation's history and tradition of firearm regulation, even when one considers former laws disarming disfavored minorities. The Act's burdens are also more onerous than requirements imposed in licensing jurisdictions, such as completion of a firearm safety course. Completion of a firearm safety course as a condition to licensure can be met, and once met it will not stand in the way of future firearm purchases or license renewal. A waiting period demands compliance repeatedly, with every single purchase, and there is no condition that can be met to avoid its future application.

others and all buyers are effectively deemed suspect. Attorney General Frey argues that the waiting period requirement is the most objective standard that could be imposed because there is no individualized inquiry. But indiscriminate application of a requirement is different from an objective application of a condition. With indiscriminate application objectivity is entirely beside the point. For essentially the same reason, the Act does not employ a definite standard. In fact, the Act is filled with and motivated by doubt—doubt about what someone could conceivably do, but far more likely will not do, upon carrying a firearm away from a seller. That kind of doubt is timeless, and certainly it was familiar to our forebears in the Colonial and Reconstruction Eras. Yet we still have a Second Amendment that reads: "[T]he right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

Viewed dispassionately, the Act employs no standard at all to justify disarming individuals, let alone a standard that can be described as narrow, objective, or definite. Consequently, I find that Plaintiffs have demonstrated that they are likely to succeed on the merits of their Second Amendment claim.

**B.    IRREPARABLE HARM**

The deprivation of a constitutional right does not automatically result in an irreparable injury. *Vaqueria Tres Monjitas*, *Inc.* v. *Irizarry*, 587 F.3d 464, 484 (1st Cir. 2009). That treatment has most commonly been reserved for deprivations of rights protected under the First Amendment. *Id.* In that context, courts imbue the rights in question with "such qualitative importance as to be irremediable by any subsequent relief." *Id.* (quoting *Pub. Serv. Co. of New Hampshire v. West Newbury,* 835 F.2d 380, 382 (1st

15

Cir. 1987)). Though there is not a strong legal tradition of treating the right protected by the Second Amendment the same way in the context of preliminary injunction motions, the Supreme Court has analogized the right protected by the Second Amendment with the rights protected by the First Amendment. *See Bruen*, 597 U.S. at 24 ("This Second Amendment standard accords with how we protect other constitutional rights. Take, for instance, the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms." (citing *Heller*, 554 U.S. at 582)).

Undoubtedly, deprivation of the right to keep and bear arms, particularly for purposes of self-defense, is of such qualitative importance to be considered irremediable through subsequent relief. Persons most harmed by the waiting period are likely to be seeking to carry for self-defense in case of confrontation. Such an interest is well represented here, by Plaintiff Andrea Beckwith. Furthermore, regardless of whatever degrees of injury one might imagine, statutory disarmament in the absence of individual cause is inimical to our Nation's history and traditions. It is to the Second Amendment what a prior restraint is to the First. I have little trouble finding irreparable injury in this context. As with cases involving the First Amendment, even a temporary deprivation results in irreparable injury. *Cf. Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

C. **REMAINING CONSIDERATIONS**

The remaining elements of the preliminary injunction standard concern the balance of equities and the public interest. Given that Plaintiffs have established a likelihood of

success and the existence of irreparable injury, I find that the balance of equities favors them as well. Similarly, although members of the public undoubtedly feel that they have a genuine interest in laws curtailing the right to keep and bear arms, their interest is not exclusive and not one that can win out in terms of an interest-balancing exercise by a court that is sworn to uphold the Constitution.

## CONCLUSION

Plaintiffs' Motion for Preliminary Injunctive Relief (ECF No. 4) is GRANTED.

**SO ORDERED.**

Dated this 13th day of February, 2025.

/s/ Lance E. Walker
Chief U.S. District Judge